```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

ROY KULICK, M.D., :
        Plaintiff, : NO. 1:09-CV-00167
  v. :
ETHICON ENDO-SURGERY, INC., : **OPINION AND ORDER**
et al., :
        Defendants. :

This matter is before the Court on Defendants' Motion for Summary Judgment (doc. 37), Plaintiff's Response in Opposition (doc. 44), and Defendant's Reply (doc. 48). For the reasons indicated herein, the Court GRANTS in part and DENIES in part Defendants' Motion.

**I. Background**

Plaintiff Roy Kulick started working for Defendant Ethicon-Endo Surgery, Inc. ("EES") as a clinical research director in June 2006 (doc. 14). According to Defendants, only within a few weeks of his employment he began alienating his peers and co-workers, he sent hostile emails, engaged in threatening conduct, and created an irreparable rift with the group for which he was hired (doc. 37). Defendants claim that when Plaintiff was unable to work with that group, Plaintiff was reassigned and even given a coach to help him improve his communication style and relationships (Id.). Despite such efforts, Defendants contend, Plaintiff

continued to act inappropriately to such an extent that a co-worker raised a concern that Plaintiff posed threat in the workplace (Id.). Based on such report, Defendant EES placed Plaintiff on paid leave and required Plaintiff to undergo a fitness for duty evaluation (Id.). Plaintiff was eventually cleared to return to work as he was found to pose no danger (Id.). However, according to Defendants, Plaintiff was unable to change his behavior, and actually yelled at his direct supervisor, Ken Sumner, and refused to perform specific tasks Sumner assigned to him (Id.). Defendants state that based on Plaintiff's insubordination, and his pattern of poor performance and behavior, EES terminated his employment (Id.).

According to Plaintiff, Defendants offer a skewed version of the facts, as his role required him to challenge his fellow employees, and he was instructed by his manager, Ken Dobler, to do so (doc. 44). In Plaintiff's view the nature of such role led to conflict and strained relationships with some of his co-workers, but he nonetheless maintained productive and positive relationships with the majority of his co-workers, and a particularly positive relationship with EES's clinical organization (Id.). He contends he received consistent praise from both Dobler and Sumner, who actually presented him with a special award for his hard work, in early 2007 (Id.). Plaintiff's evaluations show he had good ratings and he got along quite well with Sumner (Id.). In February, 2007, however, Plaintiff was disappointed with the raise and bonus he

2

received, which in his view did not accord with representations EES made to him when it recruited him (Id.).  In a meeting on February 22, 2007, Plaintiff met with Sumner and a human resources representative, after which Sumner characterized Plaintiff's behavior as "uncharacteristically hostile and verbally combative," and "unacceptably aggressive" (Id.).  Sumner did not warn Plaintiff that he viewed Plaintiff's behavior as inappropriate, but did record in February that "a clinical evaluation of [Plaintiff's] health should be considered" (Id.).  Plaintiff contends the record shows that Sumner did not request such a "clinical evalution" as of February (Id.).

Following the news of the fatal schootings at Virginia Tech in April 2007, Lori Chowning, ("Chowning"), Sumner's administrative assistant, expressed her view to Sumner that Plaintiff could pose a threat to Sumner and perhaps to other co-workers (Id.).  Sumner, who previously had no such concern, reported to Dobler and Holly DeSantis, of human resources, that he wanted Plaintiff's "emotional and mental capability to be evaluated" (Id.).  Sumner indicated to DeSantis that Plaintiff had sent him "hostile e-mails," as well as demonstrated verbal and nonverbal aggressiveness in meetings (Id.).  Sumner further likened Plaintiff to the Virginia Tech killer, stating that "the killer was deemed to show behaviors of being a 'victim' and a 'bully.' I would use the same words to describe [Plaintiff's] behavior" (Id.).

3

As a result of Sumner and Chowning's concerns, Dobler and DeSantis informed Plaintiff that two employees expressed concern for their safety, and that Plaintiff was being put on a leave of absence and would need to leave the premises immediately (Id.). Plaintiff indicates he was humiliated (Id.). Plaintiff's leave lasted from April 23 to May 21, 2007, during which time Plaintiff met with a physician to whom EES referred him for evaluation (Id.). The physician cleared Plaintiff to return to work as of May 2, 2007 (Id.).

While on leave, Plaintiff hired an attorney to oppose Defendants' having put him on leave and requiring him to undergo a psychological examination (Id.). Plaintiff's counsel corresponded with both DeSantis and with EES in-house attorneys (Id.). According to Plaintiff, DeSantis expressed to Plaintiff that she was annoyed Plaintiff had hired counsel, as she could not talk to him directly about certain issues in her human resources role (Id.). In Plaintiff's view, Defendants' annoyance with his having retained counsel was manifested on May 21, 2007, when, upon his return from leave, Sumner presented him with a written warning based on the conduct allegedly serving as a basis for the leave (Id.).

In early August, 2007, Plaintiff contends that EES in-house attorney Robert Fletcher informed him that his "job performance and his relationships with colleagues and management

4

have improved" since his return to work, that he had accepted additional responsbilities, and that he was continuing to meet expectations (doc. 44). However, by August 14, 2007, DeSantis warned Plaintiff that his job was in jeopardy and that he should leave while his performance was still considered good (Id.). On August 23, 2007, Sumner and DeSantis met with Plaintiff to inform him he was being fired for insubordination (Id.). However, a memorandum Sumner prepared on August 22, 2007, showed that Sumner, in recommending Plaintiff's termination, referred to Plaintiff's mental health, to the Virgina Tech tragedy, and to the perception of Plaintiff as a "possible shooter" (Id.).

Plaintiff brought his Complaint on March 10, 2009, which includes allegations that Defendants terminated Plaintiff because 1) they regarded him as having a disability, 2) because he consulted an attorney, and 3) because he opposed their unlawful conduct, specifically, their having put him on leave and forcing him to undergo psychological examination (doc. 14). Defendants filed the instant motion for summary judgment, contending they fired Plaintiff for insubordination and a pattern of unacceptable behavior, and not for any improper reason (doc. 37). Plaintiff has responded, and Defendants replied (docs. 44, 48), such that this matter is ripe for the Court's consideration.

**II. Applicable Legal Standard**

Although a grant of summary judgment is not a substitute

5

for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also

LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781,

784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating

8

that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991).

**III. Analysis**

As an initial matter the Court notes that Plaintiff has conceded summary judgment as to his claims for breach of contract, promissory estoppel, and wrongful termination based upon a request to contact the Food and Drug Administration (doc. 44). As such, the Court GRANTS summary judgment as to such claims. Plaintiff's remaining claims, therefore are for disability discrimination, retaliation, and for violation of public policy for having consulted an attorney. The Court will analyze such claims seriatum.

**A. Disability Discrimination**

In order to establish a prima facie case for disability discrimination, Plaintiff here must make a showing that 1) he was regarded as having a disability, 2) that he could perform the essential duties of his job, and 3) that he was subjected to an adverse employment action because of his disability. Johnson v. City of Mason, 101 F. Supp. 2d 566, 573 (S.D. Ohio 2000). Defendants challenge Plaintiff's ability to establish such prima

9

facie case, citing precedent that it is not impermissible to require a difficult employee to undergo an evaluation, that placing such an employee on paid leave for an evaluation is not an adverse action, and finally that emotional volatility or imbalance is not, as a matter of law, a disability (doc. 37, citing Mickens v. Polk County School Board, 430 F. Supp.2d 1265, 1273-74 (M.D. Fla. 2006), Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999), Krocka v. City of Chicago, 203 F.3d 507, 515 (7th Cir. 2000)). Plaintiff responds that there is plenty of evidence that Defendants regarded him as having a mental impairment, when as early as February 2007, Sumner expressed that a clinical evaluation of Plaintiff should be considered (doc. 44). Soon thereafter, evidence shows that Plaintiff's mental health became a topic of conversation among Sumner, Dobler, and others, and that Chowning likened Plaintiff to the Virginia Tech killer (Id.). Plaintiff contends his forced leave can be considered an adverse action due to its unreasonable length, noting that he was not permitted to return even after the medical evaluation cleared him to do so (Id. citing Brown v. Cox, 286 F.3d 1040, 1045 (8th Cir. 2002)(an adverse employment action need not always involve a decrease in benefits or pay), Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004)(a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action). Plaintiff contends he was subjected to

10

involuntary leave that was not "timely," and as such, a jury could find that such leave constituted an adverse action (Id.). Finally, Plaintiff argues that Sumner justified Plaintiff's ultimate termination in recounting "concern for Roy's mental health," to liken Plaintiff to "a possible shooter" (Id.). Plaintiff contends this is obvious evidence that a reasonable jury could conclude supports the theory that Defendants viewed him as disabled when they took the adverse action of terminating his employment (Id.).

Having reviewed this matter, the Court finds Plaintiff's position well-taken that there is adequate evidence in the record for Plaintiff to support his prima facie case for disability discrimination. Although the Court agrees with Defendant that in most cases a paid leave with full benefits normally does not constitute an adverse employment action, Peltier, 388 F.3d 988, the Court finds well-taken Plaintiff's argument that such a leave could constitute an adverse action should it extend beyond a reasonable time. Here, a jury could find that Defendants kept Plaintiff away from his work for weeks despite his having been cleared by a doctor to return. According to Plaintiff's deposition, even Holly DeSantis characterized the length of his leave as "ridiculous" (doc. 34). Moreover, there is no question that Plaintiff's ultimate termination can, as a matter of law, constitute an adverse employment action, and there is enough evidence in Sumner's remarks to suggest Defendants linked Plaintiff's termination to their

11

perception that Plaintiff had a mental impairment. Under these circumstances, the Court finds that Plaintiff can establish a prima facie case for disability discrimination. Ross v. Campbell Soup Co., 237 F.3d 701, 706 (6th Cir. 2001)(the question of whether an employer regarded an employee as disabled, which goes to state of mind and motivation, "is rarely susceptible to resolution at the summary judgment stage").

Having determined that Plaintiff can establish a prima facie case for disability discrimination, the burden shifts to Defendants to proffer a legitimate non-discriminatory justification for their actions. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Defendants argue they were justified in placing Plaintiff on leave based on a pattern of hostile interactions with employees, including one incident when Plaintiff punched a wall. Defendants further contend they were justified in terminating Plaintiff's employment after Plaintiff refused direct orders from Sumner unless he was reimbursed for travel expenses and when he failed to complete tasks with regard to the advisory board (doc. 37).

To demonstrate evidence of pretext, Plaintiff must provide sufficient evidence such that a jury could reject Defendants' explanation. Manzer v. Diamond Shamrock Chemicals Co., 29 F. 3d 1078, 1083 (6th Cir. 1994). Specifically, Plaintiff must show by a preponderance of the evidence either 1) that the

12

proferred reasons have no basis in fact, 2) that the proffered reasons did not actually motivate the decision, or 3) that the reasons were insufficient to motivate the action. Id. at 1084.

Plaintiff contends there is sufficient evidence to show pretext as to Defendants' explanation for his termination. Plaintiff contends the evidence shows Sumner claims he decided to recommend Plaintiff's termination after Plaintiff's alleged insubordination on August 20, 2007 (doc. 44). However, Plaintiff contends such reason did not actually motivate the decision, because DeSantis told him on August 16, 2007 that the decision to terminate him had already been made (Id.). Moreover, Plaintiff contends that evidence shows he was actually working on the projects Sumner alleged Plaintiff was refusing to perfom, and Sumner acknowledged such fact in his deposition (Id.).

Defendants reply that DeSantis has no recollection of making a statement to Plaintiff that he was going to be fired, and that Sumner clearly viewed Plaintiff's behavior on August 20 as insubordinate (doc. 48). Defendants proffer an email showing that Plaintiff knew Sumner and DeSantis would be livid over his refusal to respond to a query by the FDA, as Plaintiff wrote, "If you decide to clean out my office-pls help yourself to an espresso" (Id.). In Defendants' view, no reasonable jury could find Plaintiff was not refusing to complete tasks, and that he knew he was at risk for termination due to his insubordination (Id.).

Having reviewed this matter, the Court finds Plaintiff has proffered adequate evidence that a reasonable jury could find Defendants' proffered justification for Plaintiff's termination did not actually motivate their decision. Clearly, a jury might see it Defendants' way. Evidence shows that Plaintiff was strong-willed and arguably difficult to work with. Yet other evidence in the record shows Plaintiff was hired into a challenging role that required him to butt heads with his colleagues. Further evidence shows Plaintiff received good evaluations. Under these circumstances, taking all inferences in favor of the Plaintiff, as the Court is required to do here, the Court finds Plaintiff has proffered adequate evidence to support a showing of pretext. As such, Plaintiff's claim for disability discrimination with regard to his termination survives Defendants' motion for summary judgment.

### B. Retaliation

In order to establish a prima facie case of retaliation, Plaintiff must show 1) that he engaged in protected activity, 2) that Defendant was aware of such activity, 3) that Defendant took adverse action against Plaintiff, and 4) that there is a causal connection between such activity and the adverse action. Lockett v. Marsh USA, Inc., 354 Fed. Appx. 984, 997 (6th Cir. 2009). Plaintiff claims there is no dispute as to the first and third elements, as he clearly engaged in protected activity when he

14

complained personally and through an attorney about being put on leave and being evaluated, and he suffered an adverse action when Defendants terminated his employment (doc. 44). Defendants argue rather that Plaintiff neither shows that Sumner and Dobler knew he had engaged in protected activity, nor raises a reasonable inference of a causal connection between his protected activity and his termination (doc. 37). Plaintiff contends in response that a jury could reasonably infer that either DeSantis or Fletcher or anyone who assisted them in responding to Plaintiff's counsel's letters shared the information with Dobler and Sumner that Plaintiff had hired counsel (doc. 44). Plaintiff contends it is not necessary for Dobler or Sumner to admit they knew he had hired counsel so as to give rise to the reasonable inference that they knew (Id.). As for the causal connection, Plaintiff further argues, citing Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000), that the burden of establishing a prima facie case in a retaliation action is not onerous (Id.). Plaintiff contends the Court can draw a reasonable inference of a causal connection based on the temporal proximity between his termination and his having hired an attorney (Id.). Defendant replies that the Court may make reasonable inferences, but not giant leaps of faith and fact, as there is no evidence that Sumner knew Plaintiff had engaged an attorney (doc. 48).

       Having reviewed this matter, the Court finds Plaintiff's

15

position well-taken that he has established a prima facie case for retaliation for having opposed his involuntary leave and for having engaged an attorney. Evidence shows that DeSantis appeared frustrated and annoyed by Plaintiff's having hired an attorney. Evidence further shows that both DeSantis and Fletcher, who knew of Plaintiff's retention of counsel, played a role in the termination process. DeSantis approved Sumner's recommendation that Plaintiff be fired. Evidence further shows that Sumner simply did not recall whether DeSantis told him that Plaintiff hired an attorney, in fact Sumner stated in his deposition "I don't deny that she told me." Similarly, Dobler does not recall having knowledge that Plaintiff retained counsel while Plaintiff was still employed at EES. A jury can evaluate a witness's memory and credibility, and here, such a determination is appropriate.

 The Court further finds Plaintiff's position correct that he has proffered adequate evidence to support causation. In the Sixth Circuit, temporal proximity between protected activity and an adverse employment action can establish a causal connection where, as here, the proximity in time is approximately six months or less. DeCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004).

 The Court's analysis regarding pretext, above, is equally applicable to Plaintiff's retaliation claim. As such, Plaintiff's claim for retaliation survives summary judgment.

16

### C. Public Policy

Plaintiff's public policy claim under Ohio law is premised on the theory, like his retaliation claim, that Defendants improperly terminated his employment for consulting an attorney. The Court finds no question that it is against the clear public policy of the state of Ohio for an employer to terminate an employee for retaining legal counsel. <u>Simonelli v. Anderson Concrete Co.</u>, 99 Ohio App.3d 254, 259 (Ohio Court App. 1994)("the act of firing an employee for consulting an attorney could serve as the basis for a public policy exception to the common-law employment-at-will doctrine"). As Defendants note in their Reply, Plaintiff's arguments regarding such claim are substantially identical to those with regard to his retaliation claim (doc. 48). The Court finds its analysis above regarding the parties' contentions as to retaliation equally applicable here. As such, the Court denies Defendants' motion for summary judgment as to Plaintiff's public policy claim, finding genuine issues of material fact as to whether Defendants terminated Plaintiff's employment based on his retention of legal counsel.

### IV. Conclusion

Defendants have proffered much evidence that Plaintiff was a difficult employee. A jury might be persuaded that this was indeed that case, and that Defendants were justified in terminating Plaintiff's employment. However, the Court finds adequate evidence

in the record to establish the prima facie elements for Plaintiff's claims of disability discrimination, retaliation, and violation of Ohio public policy.  As Plaintiff has made a reasonable showing that Defendants' articulated reason for his termination, insubordination, was not actually the reason motivating such adverse action, a jury could find pretext.  As such, the claims that Plaintiff has not conceded survive Defendants' motion for summary judgment.

Accordingly, the Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment (doc. 37), such that Plaintiff's claims for breach of contract, promissory estoppel and wrongful discharge in violation of public policy are DISMISSED; while Plaintiff's remaining claims for disability discrimination, retaliation, and for violation of Ohio public policy are appropriate for a jury's consideration.  The Court therefore sets this matter for a final pretrial conference at 2:00 P.M. on April 14, 2011, and for a three-day jury trial, to commence May 24, 2011, on an on-deck basis.

SO ORDERED.


Dated: March 22, 2011          /s/ S. Arthur Spiegel
                               S. Arthur Spiegel
                               United States Senior District Judge